Slip Op. 18–82

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CHANGZHOU HAWD FLOORING CO., LTD., DUNHUA CITY JISEN WOOD INDUSTRY CO., LTD., DUNHUA CITY DEXIN WOOD INDUSTRY CO., LTD., DALIAN HUILONG WOODEN PRODUCTS CO., LTD., KUNSHAN YINGYI-NATURE WOOD INDUSTRY CO., LTD., KARLY WOOD PRODUCT LIMITED,<br><br>                                 Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>                                 Defendant. | Before: Leo M. Gordon, Judge<br><br>Court No. 12-00020 |

**OPINION and ORDER**

[Sustaining in part Commerce's Fifth Remand Results; entering judgment ordering exclusion for certain respondents.]

Dated: July 3, 2018

Gregory S. Menegaz and Alexandra H. Salzman, deKieffer & Horgan, PLLC, of Washington, DC, argued for the Plaintiffs Changzhou Hawd Flooring Co., Ltd., Dunhua City Jisen Wood Industry Co., Ltd., Dunhua City Dexin Wood Industry Co., Ltd., Dalian Huilong Wooden Products Co., Ltd., Kunshan Yingyi-Nature Wood Industry Co., Ltd, and Karly Wood Product Limited. With them on the brief was J. Kevin Horgan.

Jill A. Cramer, Mowry & Grimson, PLLC, of Washington, DC, argued for Plaintiff-Intervenor Fine Furniture (Shanghai) Limited. With her on the brief were Kristin H. Mowry, Jeffrey S. Grimson, Sarah A. Wyss, Yuzhe PengLing, and James Beaty.

Craig A. Lewis, Hogan Lovells US LLP, of Washington, DC, argued for Plaintiff-Intervenor Armstrong Wood Products (Kunshan) Co., Ltd. With him on the brief was H. Deen Kaplan.

Mark Ludwikowski Clark Hill PLC, of Washington, DC, argued for Plaintiff-Intervenor Lumber Liquidators Services, LLC. With him on the brief were R. Kevin Williams and Lara A. Austrins.

Claudia Burke, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant United States. With her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director. Of counsel was Shelby M. Anderson, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Jeffrey S. Levin, Levin Trade Law, P.C., of Bethesda, MD, argued for Defendant-Intervenor Coalition for American Hardwood Parity.

Gordon, Judge:  This action involves the final less than fair value determination of the U.S. Department of Commerce ("Commerce") in the antidumping duty investigation covering multilayered wood flooring from the People's Republic of China ("PRC") for the period of April 1, 2010 through September 30, 2010. See Multilayered Wood Flooring from the People's Republic of China, 76 Fed. Reg. 64,318 (Dep't of Commerce Oct. 18, 2011) (final determ.) ("Final Determination"), and accompanying Issues & Decision Memorandum, A-570-970 (Oct. 11, 2011), available at http://enforcement.trade.gov/frn/summary/prc/2011-26932-1.pdf ("Decision Memorandum") (last visited this date); see also Multilayered Wood Flooring from the People's Republic of China, 76 Fed. Reg. 76,690 (Dep't of Commerce Dec. 8, 2011) (amended final determ. and antidumping duty order) ("Order").

This action returns to the U.S. Court of International Trade from Commerce following a remand redetermination ordered by the U.S. Court of Appeals for the Federal Circuit directing Commerce to revise its determination of the "separate rate" and apply

the "expected method" under 19 U.S.C. § 1673d(c)(5)(B), or to justify any departure from the "expected method." Changzhou Hawd Flooring Co. v. United States, 848 F.3d 1006, 1008 (Fed. Cir. 2017) ("Changzhou Hawd VI"). Commerce "was unable to make the findings necessary to justify departure from the expected method," Final Results of Redetermination at 32 (July 21, 2017) ("Fifth Remand Results"), and thus applied the "expected method" for the separate rate, averaging the calculated rates of mandatory respondents, which was zero. The issue before the court is whether Commerce was then obligated also to exclude the separate rate respondents from the Order as it did with the mandatory respondents. Familiarity with the history of this action is presumed. See Fifth Remand Results at 2–6 (explaining history of case).

Separate rate respondents Changzhou Hawd Flooring Co., Ltd., Dalian Huilong Wooden Products Co., Ltd., Dunhua City Jisen Wood Industry Co., Ltd., Dunhua City Dexin Wood Industry Co., Ltd., Kunshan Yingyi-Nature Wood Industry Co., Ltd, and Karly Wood Product Limited (together, "Changzhou Hawd"); Fine Furniture (Shanghai) Limited ("Fine Furniture"); Armstrong Wood Products (Kunshan) Co., Ltd. ("Armstrong") challenge the Fifth Remand Results. See Pl.-Intervenor Armstrong's Comments Regarding Commerce's Final Results of Redetermination Pursuant to Court Remand, ECF No. 170 ("Armstrong Cmts."); Comments of Certain Separate Rate Appellants Opp. Fifth Remand Redetermination, ECF No. 171 ("Changzhou Hawd Cmts."); Pl.-Intervenor Fine Furniture's Comments on Commerce's Final Results of Redetermination Pursuant to Court Remand, ECF No. 172 ("Fine Furniture Cmts."); see also Def.'s Reply to

Pls.' Comments on Remand Redetermination, ECF No. 176 ("Def.'s Reply"); Reply Comments of Def.-Intervenor Regarding Commerce's Final Results of Redetermination Pursuant to Court Order, ECF No. 175 ("Def.-Intervenor Reply"). Plaintiff-Intervenor Lumber Liquidators also challenges Commerce's refusal to exclude the separate rate respondents, but also argues that Commerce should have terminated the Order ab initio. See Pl.-Intervenor Lumber Liquidators Services, LLC's Comments on Remand Redetermination, ECF No. 173 ("Lumber Liquidators Cmts.").

For the reasons set forth below, the court sustains Commerce's decision (1) denying Lumber Liquidators' request to terminate the Order ab initio, and (2) denying exclusion from the Order for the separate rate respondents that did not request voluntary examination. For the three separate rate respondents that requested voluntary examination during the investigation (Fine Furniture, Armstrong, and Dunhua City Jisen Wood Industry Co., Ltd., collectively, "Voluntary Applicants"), the court determines that Commerce arbitrarily applied its exclusion regulation, 19 C.F.R. § 351.204(e)(1), and enters judgment ordering Commerce to exclude them from the Order.

### I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon

Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr. Administrative Law and Practice § 9.24[1] (3d ed. 2018). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2018).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous."); see also Harry T. Edwards & Linda A. Elliott, Federal Standards of

Review 273–280 (3d ed. 2018) ("Comparing and Contrasting the Principal Standards of Review").

## II. Discussion

The portion of this action now before the court involves Commerce's exclusion regulation, 19 C.F.R. § 351.204(e)(1), adopted in 1997 as part of a comprehensive regulatory update following the statutory amendments made by the Uruguay Round Agreements Act. See Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) ("URAA"). Section 351.204(e)(1) provides that Commerce "will exclude from an affirmative final determination . . . , any exporter or producer for which [Commerce] determines an individual weighted-average dumping margin . . . of zero or de minimis." 19 C.F.R. § 351.204(e)(1). Although Commerce assigned the separate rate respondents a dumping margin of zero, which Commerce determined by averaging the individual weighted average dumping margins of the mandatory respondents, Commerce did not exclude the separate rate respondents because they had not been individually examined. Fifth Remand Results at 24–25.

During notice and comment for § 351.204, Commerce explained that the regulation "provides that any exporter or producer that is individually examined and that receives an individual weighted-average dumping margin . . . of zero or de minimis will be excluded from an order." Antidumping Duties; Countervailing Duties: Proposed Rulemaking, 61 Fed. Reg. 7308, 7315 (Feb. 27, 1996). Commerce further explained:

> As for former §§ 353.14 and 355.14, . . . , these provisions are no longer necessary in light of the amendments to the statute made by the URAA, . .

> . . These provisions, notwithstanding their titles, functioned as a mechanism for considering requests by voluntary respondents to be investigated. As stated by the Department when it adopted § 351.14:
>
>> If the Department includes a producer or reseller in its investigation and determines that the producer or reseller had no dumping margin during the period of investigation, the Department would automatically exclude that producer or reseller from the antidumping duty order, even if the producer or reseller did not request exclusion under the procedures described in [§ 353.14]. The purpose of this section merely is to provide an opportunity for producers and resellers that the Department might not otherwise include in its investigation to request that the Department specifically include and investigate them.
>
> Final Rule (Antidumping Duties), 54 Fed. Reg. 12,742, 12,748 (1989). . . .
>
> Given their original purpose, §§ 353.14 and 355.14 have become superfluous in light of section 782(a) of the Act and § 351.204(d) (which establish new procedures for dealing with voluntary respondents) and § 351.204(e)(3) (which deals with exclusion requests in CVD investigations conducted on an aggregate basis). Under these provisions, decisions on exclusions will be based on a firm's actual behavior, as opposed to assertions regarding its possible future behavior.

Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,295, 27,311 (1997) (final rule). In the Fifth Remand Results Commerce explained that "the revised statutory language and regulations allowed for companies not selected for individual examination to request participation as voluntary respondents." Fifth Remand Results at 13. In this investigation, however, Commerce rejected all voluntary examination requests, foreclosing any path to exclusion for respondents seeking an individual weighted average margin. See Decision Memorandum at cmt. 43 ("it was neither necessary nor practicable to individually examine the companies that requested voluntary respondent treatment").

Plaintiffs and Defendant argue that the action should be resolved under the first prong of Chevron, contending that the statute mandates one and only one outcome on the issue before the court: whether separate rate respondents—in a resource-constrained, non-market economy investigation—must be excluded from the antidumping duty order if they are assigned a zero percent all-others rate. See Armstrong Cmts. at 4 (arguing that the "governing statute is crystal clear" and mandates exclusion of all producers or exporters assigned a de minimis rate); Fine Furniture Cmts. at 5 ("Statute Requires Exclusion Where Commerce Assigns a Zero/De Minimis Rate"); Def.'s Reply at 11–13 ("The Statute Unambiguously Precludes The Relief That The Separate Rate Plaintiffs Seek").[1]

---

[1] The court finds unpersuasive Defendant and Changzhou Hawd's arguments about Commerce's prior practice for dealing with exclusion from an order (albeit disagreeing about what that practice is). Commerce reaches back to a 28-year old determination in which Commerce did not exclude respondents assigned an "all-others" rate of zero. See Fifth Remand Results at 12 (citing Certain Small Business Telephone Systems and Subassemblies Thereof from Taiwan, 54 Fed. Reg. 42,543 (Oct. 17, 1989) ("SBTS from Taiwan"). Changzhou Hawd identifies one prior determination in which Commerce appears to have treated respondents assigned a de minimis "all-others" rate as though they were excluded despite a final affirmative determination. See Changzhou Hawd Cmts. at 5–7 (citing Certain Automotive Replacement Glass Windshields from the People's Republic of China, 72 Fed. Reg. 70,294 (Dec. 11, 2007) (Amend. Final Determ.) ("Glass Windshields"). SBTS from Taiwan pre-dates all the applicable statutory and regulatory authority. And the issue of exclusion was not expressly litigated in Glass Windshields. Therefore, the court has not found either administrative determination to be helpful or informative. The court likewise did not find informative or helpful, Changzhou Hawd's reliance on market economy administrative proceedings that resulted in negative determinations.

Court No. 12-00020 Page 9

The court does not believe Congress had this precise question in mind when it drafted the applicable provisions:

19 U.S.C. § 1673d(a)(4) requires Commerce to exclude <u>any</u> weighted average dumping margin that is de minimis:

> (4) De minimis dumping margin
>
> [For a final determination], [Commerce] shall disregard any weighted average dumping margin that is de minimis . . . .[2]

19 U.S.C. § 1677(35)(B) defines the term "weighted average dumping margin":

> The term "weighted average dumping margin" is the percentage determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer.

19 U.S.C. § 1673d(b)(5) describes the term "all-others rate":

> (5) Method for determining estimated all-others rate
>
> (A) GENERAL RULE
>
> . . . the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely under section 1677e of this title.

---

[2] The Statement of Administrative Action notes that "{e}xporters or producers with <u>de minimis</u> margins will be excluded from any affirmative determination." Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, at 844 (1994), reprinted in 1994 U.S.C.C.A.N. 4040. Additionally, Article 5.8 of the Anti-Dumping Agreement requires that "{t}here shall be immediate termination in cases where the authorities determine that the margin of dumping is de minimis, or that the volume of dumped imports, actual or potential, or the injury is negligible." Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994, art. 5.8.

> (B) EXCEPTION
>
> If the estimated weighted average dumping margins established for all exporters and producers individually investigated are zero or de minimis margins, or are determined entirely under section 1677e of this title, the administering authority may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated.

19 U.S.C. § 1673d(c)(1)(B)(i) requires Commerce to

> (I) determine the estimated weighted average dumping margin for each exporter and producer individually investigated, and
>
> (II) determine, in accordance with paragraph (5), the estimated all-others rate for all exporters and producers not individually investigated. . . .

19 U.S.C. § 1677f-1(c) elaborates upon Section 1673d(c)(1)(B)(I):

> (1) GENERAL RULE In determining weighted average dumping margins under section . . . 1673d(c) . . . of this title, [Commerce] shall determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise.
>
> (2) EXCEPTION If it is not practicable to make individual weighted average dumping margin determinations under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, [Commerce] may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to—
>
>> . . .
>>
>> (B) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.

Section 1677f-1(c)(1) obligates Commerce to determine an individual weighted average dumping margin for <u>all</u> respondents. This is rare in practice. Here, Commerce did not

individually investigate the hundred-some-odd producer/exporters of multilayered wood flooring from the PRC. Resource constrained, Commerce selected the two largest volume producers/exporters as mandatory respondents. Both of them, after court-ordered remands, were assigned de minimis dumping margins (zero percent) and were excluded from the Order. See Baroque Timber Indus. (Zhongshan) Co. v. United States, Court No. 12-00007, Final Results of Redetermination[3] at 52 (Nov. 14, 2013) ("First Remand Results").

Not so long-ago Commerce's calculation of de minimis margins for all individually investigated respondents would have led to termination of an order ab initio because there was no basis for an affirmative less than fair value determination (no evidence of dumping). Things changed with Commerce's adoption of its PRC-wide entity policy, see Import Administration Policy Bulletin 05.1: Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries (Apr. 5, 2005), which effectively enables Commerce to make an affirmative less than fair value determination even though all individually investigated mandatory respondents receive de minimis margins, which is what happened in this action. See Final

---

[3] This action was previously consolidated with an action challenging the Final Determination brought by the mandatory respondents. See Baroque Timber Indus. (Zhongshan) Co. v. United States, Court No. 12-00007. Commerce's results of the first remand in this matter assigned de minimis rates to the mandatory respondents, and assigned a rate of 6.41 percent to the separate rate respondents based on a simple average of the three zero-percent mandatory respondent margins and a PRC-wide entity margin of 25.62 percent. See First Remand Results at 45.

Determination, 76 Fed. Reg. at 64,322. Non-participating companies were deemed non-cooperative and assumed to be part of a government-controlled PRC-wide entity. Id. They were assigned the highest calculated transaction-specific rate among mandatory respondents, 58.84 percent, as total adverse facts available. Id. Despite no direct evidence of dumping, Commerce here imposed an antidumping duty order on multilayered flooring from the PRC based on indirect evidence (an adverse inference) against the PRC-wide entity. Lumber Liquidators' argument that Commerce must terminate the Order ab initio never comes to terms with this aspect of Commerce's affirmative determination. They fail to challenge either the PRC-wide entity policy or the PRC-wide rate. See generally Lumber Liquidators Cmts. The court therefore must sustain Commerce's decision to deny Lumber Liquidators' request that Commerce terminate the Order ab initio.

Commerce ultimately did exclude the mandatory respondents from the Order. To derive the separate rate, Commerce averaged the zero rates assigned to the mandatory respondents under the "expected method". See Fifth Remand Results at 8. The question is whether that zero percent "all-others rate", 19 U.S.C. §§ 1673d(c)(1)(B)(i)(II), 1673d(c)(5), constitutes "any" de minimis weighted average dumping margin that Commerce must "disregard" pursuant to 19 U.S.C. § 1673d(a)(4).

The term "any" is broad, and the "all-others rate" is just a proxy for the individual weighted average dumping margins Commerce, in theory, should calculate for all respondents pursuant to § 1677f-1(c)(1) (which, as noted above, is rare in practice).

Article 5.8 of the Anti-Dumping Agreement also speaks in broad terms, requiring "immediate termination in cases where the authorities determine that the margin of dumping is de minimis…." Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994, art. 5.8. It is entirely possible, therefore, that Congress intended Commerce to disregard a zero percent all-others rate (and exclude the separate rate respondents from the final affirmative dumping determination). At the same time, however, the "all-others rate" is derivative in nature, and because it has general applicability to all non-examined separate rate respondents, it is not really quite as "specific" as what is contemplated by the "weighted average dumping margin" of § 1677(35)(B), or an "individual" weighted average dumping margin of § 1677f-1(c)(1).

That means there is some free play in the statute. And that, in turn, implicates the second prong of Chevron, under which the court must defer to Commerce's permissible construction of the statute. See Chevron, 467 U.S. at 842–43; Eurodif S.A., 555 U.S. at 316 (An agency's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous."); Wheatland Tube Co. v. United States, 495 F.3d 1355, 1361 (Fed. Cir. 2007) (To determine whether Commerce's interpretation is reasonable, the court "may look to 'the express terms of the provisions at issue, the objectives of those provisions, and the objectives of the antidumping scheme as a whole.'"). The court cannot conclude that Commerce's desire to treat "exclusion as an extraordinary measure, and one that should only be available in limited circumstances to companies that have been subject to

individual investigation and all that entails (i.e., providing full and complete questionnaire responses, cooperating with the Department, subject to verification, etc.)", Fifth Remand Results at 25, unreasonably resolves ambiguous statutory language, or advances a policy prescription at odds with the antidumping statute.

The separate rate respondents argue that Commerce waited too long over the course of the litigation to apply the exclusion regulation. See Armstrong Cmts. at 2–3; Fine Furniture Cmts. at 14–19; see also id. at 15–17 (highlighting that plaintiffs expressly requested exclusion from the order as part of their initial Complaint, subsequent motions for summary judgment on the agency record, in their comments and briefing on the prior remand redeterminations, and in oral argument before the Federal Circuit). Defendant acknowledges that plaintiffs raised the issue of exclusion early on, but avers that Commerce was not squarely presented with the issue of whether separate rate plaintiffs should be excluded from the order until the Fifth Remand Results. See Def.'s Reply at 9–10 ("We acknowledge that certain separate rate plaintiffs have long taken the position that they should be excluded from the order. But it was not necessary for Commerce to evaluate the merits of plaintiffs' argument until the Federal Circuit reversed this Court's judgment and Commerce assigned a zero margin to the separate rate plaintiffs." (internal citation omitted)).

The court understands that it would have been preferable if Commerce had raised the exclusion regulation before the Federal Circuit in Changzhou Hawd VI, and explained that there would be no substantive effect to assigning the separate rate respondents a

zero percent margin. That omission, however inefficient, does not invalidate the regulation or mute its operation. It was duly promulgated in 1997 and carries the force of law. What does give the court pause, however, is Commerce's application of the exclusion regulation to the Voluntary Applicants. Given the history of the exclusion regulation in which concerns about limiting exclusion to selected/mandatory respondents were mitigated through the availability of voluntary examination, there is an inherent arbitrariness in Commerce (1) issuing a blanket refusal to entertain voluntary examination requests, and (2) subsequently denying exclusion to the Voluntary Applicants that were assigned a "representative" separate rate of zero (which again, is just a proxy for the individual weighted average dumping margins Commerce should theoretically calculate for all respondents).

Defendant notes that the Voluntary Applicants did not challenge Commerce's respondent selection. See Def.'s Reply at 12, 22 (explaining that Commerce's respondent selection decisions have not been challenged). Although they chose not to appeal Commerce's refusal to conduct any voluntary examinations, the Voluntary Applicants may nevertheless challenge Commerce's separate and distinct decision denying them exclusion from the Order. That determination (like many Commerce determinations), just happens to comprise numerous other decisions Commerce made through the course of the proceeding: mandatory respondent selection, treatment of voluntary examination requests, the calculation of each of the mandatory respondents' margins, and the calculation of the separate rate, among others. Commerce's determination that resource

constraints precluded voluntary examinations may itself have been reasonable. Having made that decision, Commerce's subsequent decision to refuse to exclude Voluntary Applicants assigned a zero percent margin is not.

Commerce's exclusion regulation requires individual examination for exclusion because, as a policy matter, it wants to confirm that a specific party is not in fact dumping. That policy carries a corresponding inference or assumption that a party is trading unfairly unless it can demonstrate with its own direct evidence that it is not. In explaining the enactment history of the exclusion regulation, Commerce acknowledged that "the revised statutory language and regulations allowed for companies not selected for individual examination to request participation as voluntary respondents." Fifth Remand Results at 13.

The court believes Commerce's application of its exclusion regulation to the Voluntary Applicants it assigned "representative" zero percent margins has two insurmountable problems. The first is Commerce's refusal to conduct any voluntary examinations, preventing the Voluntary Applicants from demonstrating directly their own evidence of fair trading. The second is Commerce's continuing assumption or inference that Voluntary Applicants denied individual examination and ultimately assigned a "representative" zero percent margin were nevertheless unfairly trading, precluding exclusion. The court questions how a reasonable mind could maintain such an assumption or inference against the Voluntary Applicants. With that said, the court does believe there is a material difference between those separate rate respondents that

Court No. 12-00020                                                                                          Page 17

requested voluntary examination, and those that did not. In the court's view, those that did not cannot overcome the regulation and the underlying inference/assumption that they were unfairly trading despite being assigned the same "representative" zero percent margin.

As for remedy, the court typically remands for further consideration when it identifies unreasonableness or arbitrariness in agency decision-making. See Harry T. Edwards & Linda A. Elliott, Federal Standards of Review 276–77 (3d ed. 2018) ("When a court finds that an agency action is arbitrary and capricious, it will normally remand the case to the agency for further consideration. . . . Thus when an administrative action is found to be arbitrary and capricious, an agency has an opportunity to revisit its decision and provide an adequate justification or reach a different conclusion."). Here, though, too much time has passed for Commerce to individually examine the Voluntary Applicants. Cf. Changzhou Hawd Flooring Co. v. United States, 39 CIT ___, ___, 44 F. Supp. 3d 1376, 1390 (2015) ("while Commerce retains the discretion to reasonably reopen the record, its decision to conduct a full individual investigation of Changzhou Hawd at such a late date is arbitrary and capricious"). Also, this is the seventh court decision, reviewing the sixth administrative determination. And there may well be an appeal.[4] A final judgment moves this action toward final resolution. The court does not believe a remand for

---

[4] After many court decisions and remands, trade cases have a way of taking on the feel of Jarndyce and Jarndyce: "Jarndyce and Jarndyce drones on. This scarecrow of a suit has, over the course of time, become so complicated, that no man alive knows what it means." Charles Dickens, Bleak House, Chapter 1 (1852–53).

reconsideration is necessary. Instead, the court believes the proper remedy is entry of judgment declaring Commerce's failure to exclude the Voluntary Applicants arbitrary, and directing Commerce to exclude them from the Order ab initio.

### III. Conclusion

Based on the foregoing, the court sustains Commerce's decision (1) denying Lumber Liquidators' request to terminate the Order ab initio, and (2) denying exclusion from the Order for the separate rate respondents that did not request voluntary examination. For the Voluntary Applicants, the court determines that Commerce arbitrarily applied its exclusion regulation, 19 C.F.R. § 351.204(e)(1), and will enter judgment ordering Commerce to exclude them from the Order. Judgment will enter accordingly.

       /s/ Leo M. Gordon
    Judge Leo M. Gordon

Dated: July 3, 2018
      New York, New York